UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ARTHUR MATHEWS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:05CV1488 JCH ) |
| ST. LOUIS UNIVERSITY, | ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Saint Louis University's ("SLU") Motion for Summary Judgment, filed July 24, 2006. (Doc. No. 33). The matter is fully briefed and ready for disposition.

**BACKGROUND**

By way of background, Plaintiff Arthur Mathews, an African-American, was hired in July, 1970, by Saint Louis University as a patrolman for its Department of Public Safety (DPS). (Defendant's Memorandum in Support of its Motion for Summary Judgment ("Defendant's Memo in Support"), P. 1, citing Plaintiff's Dep., PP. 12-13). From that date until his termination on August 27, 2003, Plaintiff was continually employed by the University. Plaintiff was promoted three times during his tenure with SLU – first to the rank of Corporal, second to the rank of Sergeant, and finally to the rank of Lieutenant in charge of the "C" watch. (Defendant's Memo in Support, PP. 1-2, citing Plaintiff's Dep., PP. 14-16, 21-22, 33-34; Titone Aff., ¶ 3). Plaintiff's third promotion, in 1995, was awarded by the Chief of DPS, Jack Titone ("Titone"), and the Captain of DPS, Rick Younger

1

("Younger"). (Id., P. 2).[1]

From his promotion to Lieutenant in 1995 through 2001, Plaintiff received annual performance appraisals from Titone and Younger rating his performance as either meeting or exceeding expectations. (Defendant's Statement of Uncontroverted Material Facts ("Defendant's Facts"), ¶ 1, citing Plaintiff's Dep., PP. 97-115; Defendant's Exh. E). Plaintiff was rewarded for his performance with annual raises that were consistently above the mean salary pool. (Defendant's Memo in Support, P. 3, citing Plaintiff's Dep., PP. 97-115; Defendant's Exh. F). In his 2002 performance appraisal, however, Titone and Younger made of point of alerting Plaintiff that he needed to, "assert himself more with his supervisors and officers to ensure that the rules, regulations, policies, and procedures are followed in a consistent manner." (Id., citing Plaintiff's Dep., P. 116; Defendant's Exh. G).

In 2001, Connie Tillman ("Tillman") was promoted to the rank of Corporal, and transferred to the "C" watch under Plaintiff's command. (Defendant's Memo in Support, P. 3, citing Plaintiff's Dep., PP. 39, 44; Titone Aff., ¶ 8). Tillman's transfer caused some problems within "C" watch, because her "strict" management style contrasted sharply with Sergeant Leslie Lorenz's ("Lorenz") loose enforcement of the rules. (Id., citing Plaintiff's Dep., PP. 62-66, 131-134, 138-146, 152-159, 162-163; Titone Aff., ¶ 9). In January, 2003, Tillman complained to Plaintiff that the officers under her supervision were acting in a disrespectful manner towards her. (Defendant's Facts, ¶ 3, citing

---

[1] The DPS is organized like a police department with regards to its chain of command. Atop the chain is the Chief. The second in command is a Captain, and beneath the Captain are three Lieutenants. The DPS has three watches: "A" watch, "B" watch," and "C" watch. Each Lieutenant is in charge of a watch. Furthermore, each watch has a Sergeant and a Corporal, who are subordinate to the Lieutenant, and responsible for the day to day supervision of the watch's officers. (Defendant's Memo in Support, P. 2 n. 1, citing Plaintiff's Dep., PP. 16-32).

Plaintiff's Dep., PP. 253-254). Rather than address the matter personally, Plaintiff responded by telling Tillman to address the situation herself during the January 12, 2003, roll call meeting. (Id., citing Plaintiff's Dep., PP. 66, 253-256).

During a meeting in February, 2003, Tillman and another officer, Ken Merlotti ("Merlotti"), informed Plaintiff of a rumor circulating among the officers in "C" watch, in which it was claimed Tillman and Merlotti had engaged in sexual conduct on SLU property. (Defendant's Facts, ¶ 4, citing Plaintiff's Dep., PP. 234-250, 278). The rumor apparently was started by one of Plaintiff's officers, Walter Allen ("Allen"). (Defendant's Memo in Support, P. 5, citing Plaintiff's Dep., PP. 234-250, 278). According to Tillman and Merlotti, Plaintiff did not investigate further, instead informing them that neither officer would be so upset if the rumor were not true. (Defendant's Facts, ¶ 5, citing Plaintiff's Dep., PP. 239-250). Tillman and Merlotti then reported the problem to Titone, who realized the rumor was an issue of sexual harassment, and referred it to the SLU Office of Diversity and Affirmative Action ("Office of Diversity"). (Id., ¶ 6, citing Titone Aff., ¶ 14; Plaintiff's Dep., P. 249). After investigating, the Office of Diversity recommended that Plaintiff be disciplined for not conducting an investigation, and that Allen be reprimanded for circulating the rumor. (Defendant's Memo in Support, P. 5, citing Titone Aff., ¶ 14; Defendant's Exh. K). As a result, Plaintiff's performance evaluation, dated March 1, 2003, contained some negative feedback from his superiors concerning his handling of sensitive personnel issues, and rated his overall performance as "needs improvement." (Defendant's Exh. S).

Around the same time, Titone and Younger were in almost weekly contact with Plaintiff regarding the perceived failure of officers on his shift to enforce the University's parking policy. (Defendant's Facts, ¶ 8, citing Titone Aff., ¶ 15; Plaintiff's Dep., PP. 282, 284-291; Defendant's

3

Exhs. L, M, N and O). This inquiry into the towing of illegally parked cars was prompted, in part, by a formal complaint lodged against the University by a disabled student. (Id., ¶ 9, citing Plaintiff's Dep., PP. 34-37; Defendant's Exh. P). After an investigation, Younger concluded that Plaintiff had violated department policies by ordering his subordinates not to tow cars, and that Plaintiff thus should be disciplined for insubordination, failure to carry out a lawful order, and failure to perform his duties in a prompt and diligent manner. (Id., ¶¶ 10, 11, citing Titone Aff., ¶¶ 18, 19; Defendant's Exh. P).

As a result of the above infractions, including Plaintiff's violation of the University's Sexual Harassment Policy, his failure to address the issues on his watch, especially those pertaining to Corporal Tillman, and his failure to adhere to the University towing policy, Plaintiff was placed on Critical Warning under the University's Corrective Counseling Policy in May, 2003. (Defendant's Facts, ¶ 12, citing Titone Aff., ¶ 19; Defendant's Exh. Q). Plaintiff further was warned that, "[a]ny further instances of violation of University or departmental policy may lead to further disciplinary action up to and including termination." (Defendant's Exh. Q).

According to evidence submitted by Defendant, Plaintiff again violated DPS rules in July of 2003. (Defendant's Memo in Support, PP. 7-10). Specifically, Sergeant Lorenz, a C-shift supervisor who reported to Plaintiff, informed Plaintiff that Allen said employees of a nearby Shell Gas Station were planning to file a citizen complaint against Tillman. (Defendant's Facts, ¶ 14, citing Plaintiff's Dep., PP. 307-309; Defendant's Exh. T).[2] In response to this news, Plaintiff went to the Shell Station with Sergeant Lorenz, and interviewed a clerk of the station. (Id., ¶ 15, citing Plaintiff's Dep., PP.

---

[2] Specifically, Allen said a Shell employee had complained of harassment by a female officer described as resembling Tillman. (Defendant's Memo in Support, PP. 7-8, citing Defendant's Exh. U).

4

313, 317-319, 322; Defendant's Exh. W). Plaintiff then had Lorenz write a report summarizing the interview that Plaintiff apparently conducted. (Id., citing Plaintiff's Dep., P. 322). In that memorandum, dated July 16, 2003, Lorenz indicated the Shell clerk confirmed that Tillman had harassed her. (Id., citing Plaintiff's Dep., PP. 325-326; Defendant's Exh. T).

Plaintiff failed to bring Allen's allegations regarding Tillman to the attention of either Titone or Younger. (Defendant's Facts, ¶ 16, citing Plaintiff's Dep., PP. 327, 329, 349-350; Titone Aff., ¶ 26). Chief Titone eventually found out about the Lorenz memorandum, however, and assigned an independent investigator, Larry Purvis ("Purvis"), to investigate the purported incident. (Id., ¶ 17, citing Plaintiff's Dep., PP. 335, 339-340; Titone Aff., ¶¶ 20-22; Defendant's Exh. W).[3] In subsequent investigatory interviews with the clerk at issue and the manager of the Shell Station, conducted by Investigator Purvis and Titone, both employees denied any inappropriate conduct on the part of Corporal Tillman. (Id., ¶ 19, citing Titone Aff., ¶ 25; Defendant's Exhs. W, X).

Titone terminated Plaintiff's employment on August 27, 2003. (Defendant's Memo in Support, P. 10). The stated reason for the termination was SLU's determination that Plaintiff failed to deal appropriately with the Shell Station incident, by failing to notify his superiors of the alleged citizen complaint in a timely manner, in direct violation of the Citizen Complaint Policy, and by instructing Lorenz to summarize an interview that she did not conduct directly. (Defendant's Facts, ¶ 21, citing Titone Aff., ¶ 26; Defendant's Exh. Y). Both Officer Allen, an African-American male,

---

[3] Purvis and Titone discussed the Shell incident with Plaintiff, who reported the Shell clerk acknowledged she had been harassed by Tillman. (Defendant's Facts, ¶ 18, citing Titone Aff., ¶ 24; Defendant's Exh. W).

5

and Sergeant Lorenz, a Caucasian female, were terminated for their roles in the incident as well.[4] (Id., ¶ 22, citing Titone Aff., ¶ 26; Defendants' Exhs. Z, AA).

Plaintiff filed his Complaint in this matter on September 15, 2005, alleging unlawful discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").[5] (Doc. No. 3). As stated above, Defendant filed the instant Motion for Summary Judgment on July 24, 2006, alleging there are no material facts in dispute, and Defendant is entitled to judgment as a matter of law on Plaintiff's claims.

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not

---

[4] Sergeant Lorenz's termination was also based on her buying of pirated DVDs on University property. (Defendant's Facts, ¶ 22, citing Titone Aff., ¶ 26; Defendant's Exh. AA).

[5] In an Order entered February 1, 2006, this Court dismissed Plaintiff's claims of discrimination on the bases of age and gender. (Doc. No. 19).

6

the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

As stated above, in his Complaint Plaintiff alleges unlawful discrimination on the basis of race, in violation of Title VII. (Doc. No. 3). Because he lacks direct evidence of discrimination, Plaintiff's Title VII claim is analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Gilmore v. AT & T, 319 F.3d 1042, 1046 (8th Cir. 2003); Sherman v. Runyon, 235 F.3d 406, 409 (8th Cir. 2000) (citations omitted); see also Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000) (citation omitted). Under this framework, Plaintiff has the initial burden of establishing a *prima facie* case of discrimination. Twymon v. Wells Fargo & Co., --- F.3d ---, 2006 WL 2595961 at *7 (8th Cir. Sept. 12, 2006). Once Plaintiff has established a *prima facie* case of employment discrimination, a rebuttable presumption of discrimination arises; the employer then has the burden of explaining its actions with legitimate, nondiscriminatory reasons. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993); see also Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005); Dorsey v. Pinnacle Automation Co., 278 F.3d 830, 836 (8th Cir. 2002). If the Defendant articulates such reasons, the presumption of discrimination disappears, and Plaintiff must prove that Defendant's proffered reasons

are merely a pretext for discriminatory animus. Id.; see also Tolen v. Ashcroft, 377 F.3d 879, 882 (8th Cir. 2004) (citation omitted); Tatom, 228 F.3d at 931.

In the instant case, the Court assumes without deciding that Plaintiff presents a *prima facie* case of race discrimination. With respect to Defendant's burden, the Eighth Circuit has explained the standard for rebuttal of Plaintiff's *prima facie* case as follows:

> This burden is not onerous, and the explanation need not be demonstrated by a preponderance. The defendant need not persuade the court that it was actually motivated by the proffered reasons. Rather, it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff that would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. If the defendant offers a facially nondiscriminatory explanation, regardless of its persuasiveness, the presumption in plaintiff's favor evaporates and it is left for the trier of fact to determine whether the plaintiff has proven that the defendant's action was motivated by discrimination.

McCullough v. Real Foods, Inc., 140 F.3d 1123, 1127 (8th Cir. 1998), quoting Buchholz v. Rockwell Int'l Corp., 120 F.3d 146, 150 (8th Cir. 1997) (citations and internal quotations omitted).

As detailed above, Defendant here has produced specific evidence of Plaintiff's failure to perform his job satisfactorily. Plaintiff himself was made aware of the gravity of his performance deficiencies through numerous e-mails and letters, addressed to him by his supervisors over a period of several months. First, DPS cited Plaintiff's repeated failure to enforce the University's parking policy, by requiring his shift to tow vehicles illegally parked in spaces reserved for the handicapped. Second, DPS cited Plaintiff's mishandling of a subordinate's request for assistance in addressing alleged sexual harassment. Third, DPS noted Plaintiff's failure properly to handle a threatened citizen complaint against the University that had been brought to his attention. These instances, in addition to Plaintiff's unsatisfactory performance in the areas of leadership, communication, and human resources management (all documented in Plaintiff's 2002 annual performance appraisal), form the

8

foundation of Defendant's legitimate termination claim.

Because Defendant has met its burden of rebutting Plaintiff's *prima facie* case, the burden then shifts to Plaintiff to establish a genuine controversy concerning intentional discrimination. The Eighth Circuit explained Plaintiff's burden in <u>Rothmeier v. Investment Advisers Inc.</u>, stating as follows:

> Consequently, the rule in this Circuit is that [a race] discrimination plaintiff can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [unlawful discrimination] was a determinative factor in the adverse employment decision.

<u>Rothmeier v. Investment Advisers, Inc.</u>, 85 F.3d 1328, 1336-37 (8th Cir. 1996).

In the instant case, Plaintiff presents absolutely no evidence tending to demonstrate that Defendant's legitimate, non-discriminatory explanations for its actions were merely a pretext for discrimination. Absent such a showing, Defendant's Motion for Summary Judgment, on the basis of its legitimate, nondiscriminatory reasons for the termination, must be granted.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 33) is **GRANTED**, and Plaintiff's claims are dismissed with prejudice. An appropriate Judgment will accompany this Memorandum and Order.

Dated this <u>6th</u> day of October, 2006.

                                            /s/ Jean C. Hamilton
                                            UNITED STATES DISTRICT JUDGE